# In the United States Court of Federal Claims

No. 09-399 C
(Filed December 21, 2012)

| | |
|---|---|
| P&K CONTRACTING, INC.,<br>　　　　　　　　Plaintiff,<br>　　　v.<br><br>THE UNITED STATES,<br>　　　　　　　　Defendant. | ) Cross-Motions for Summary Judgment;<br>) Burdens; Request for Equitable Adjustment;<br>) Authority to Modify Contract; Mutual Mistake;<br>) Risk of Increased Costs; Implied Warranty of<br>) Adequate Specifications; Superior Knowledge;<br>) Equitable Estoppel; Implied Covenant of Good<br>) Faith and Fair Dealing. |

---

## OPINION AND ORDER

*Carol A. Sigmond*, New York, NY, for plaintiff.

*Matthew P. Roche*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant with whom were *Stuart G. Delery*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, *Bryant G. Snee*, Deputy Director, and *Major Joseph E. Krill*, of counsel.

**Merow**, *Senior Judge*.

## Introduction

Reference is made to the factual background and procedural history of this litigation which involves a claim for $245,525.00 arising from a contract awarded by the Department of the Army (Army) for the renovation of the Indoor Marksmanship Center (IMC) at the United States Military Academy at West Point (West Point) detailed in the court's prior Opinion denying defendant's initial Motion for Summary Judgment. *P&K Contracting, Inc. v. United States*, No. 09-399C, 2011 WL 4721846 (Oct. 6, 2011).

Thereafter, plaintiff filed an Amended Complaint which restated its claim for breach of contract due to superior knowledge and added a claim of mutual mistake. (ECF No. 37.) Defendant filed an Amended Answer (ECF No. 38) and a second Motion for Summary Judgment (Def.'s Mot.). (ECF No. 44.) Plaintiff filed a

Memorandum of Law in Opposition to Defendant's Second Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment on its claim for mutual mistake (Pl.'s Mem.).  (ECF No. 47.)  Defendant then filed a Response to Plaintiff's Cross-Motion and Reply in Support of Defendant's Motion for Summary Judgment.  (ECF No. 58.)  Plaintiff did not file a Reply to Defendant's Response and the time for doing so has expired.

For the following reasons, defendant's second Motion for Summary Judgment is granted and plaintiff's Cross-Motion is denied.

## Background

As outlined in the court's initial Opinion, the Army contracted for the renovation of the IMC building which had been damaged by fire.  The target system for the pistol and rifle ranges in the IMC building was to be acquired by the West Point Association of Graduates (AOG), a private alumni organization located at West Point, and then gifted to West Point.  (Def.'s Mot., Conklin Dep. ¶ 2, A87, ECF No. 44-1; Pl.'s Mem., Saunders Dep. 18-19, 42-44, ECF No. 52-1.)  West Point chose the engineering firm STV, Inc. to design the IMC renovation.  (Def.'s Mot., Conklin Dec. ¶ 6, A88 ECF No. 44-1; Shah Dep. 40, A227, ECF No. 44-2.)  The initial design work was apparently funded by AOG so they would have something to show potential donors.  (Pl.'s Mem., Saunders Dep. 61-62, ECF No. 52-1; Parts I & II, Ex. 2, ECF Nos. 53-1, 54-1.)  STV's design included drawings which specified the heating, ventilation, and air conditioning (HVAC) system to be installed for the ranges.  (Pl.'s Mot., Saunders Dep. 64-65, ECF No. 52-1.)  A shooting range HVAC system must provide enough air velocity to clear fumes, including gun powder and lead residue from the discharge of weapons, without causing air movement which could disturb the targets.  (*Id*. at 67, 75, 76; Def.'s Mot., Shah Dep. 19-20, 33, 109, A222, A225, A244, ECF No. 44-2.)

In selecting the company to provide the target systems LTC Earl Duston Saunders, Ret., an AOG employee and Director of Annual Giving and then Chief of Alumni Support Operations, also a volunteer coach of the West Point Cadet Pistol Team [1] (Pl.'s Mot., Saunders Dep. 12-13, 15, ECF No. 52-1), confined his search to

---

[1]   LTC Saunders had a military and an AOG e-mail address. (Def.'s Mem., Resps. Req. (continued...)

two firms, Rangetech International Corporation (Rangetech) and Caswell Detroit Armor Company (Caswell), considered to be two of the preeminent makers of target systems and experts in shooting range ventilation systems. (*Id.* at 50.)  The United States Navy's chief range specialist advised LTC Saunders that choosing one of these two companies would eliminate problems. (*Id.* at 50-51.)  LTC Saunders visited the home offices of both firms and examined several range projects they had completed. (*Id.* at 51.)  His recommended choice for the AOG gift of the range target systems was Caswell and Caswell did subsequently install the target systems. (*Id.* at 51-57.)

For the IMC building renovation, on July 11, 2000, the Army, acting through West Point, issued Solicitation No. DAAG 60-00-R-0005 seeking offers for a firm, fixed price contract. (Def.'s Mot., Conklin Dec. ¶ 2, A87, Ex. 1, A92-157, ECF No. 44.)  The Solicitation provided that "[t]he offeror agrees to perform the work required at the prices specified below in strict accordance with the terms of this solicitation." (*Id.* at A93.)  The STV design drawings for HVAC were included in the Solicitation which also provided that, "THE CONTRACTOR SHALL SUBCONTRACT THE HVAC SYSTEM WITH RANGETECH OR CASWELL AND SHALL SUBMIT PROOF OF THIS RELATIONSHIP WITH ITS OFFER." (*Id.* at A142.)  Also, the "HVAC system shall be installed by an approved HVAC Subcontractor.  Approved HVAC Subcontractors are: Rangetech, xlL and Caswell International (Detroit Armor) MN." (*Id*. at A115.)

LTC Saunders showed Rangetech and Caswell the STV drawings during his discussions with them concerning the target systems AOG would acquire.  (Pl.'s Mem., Saunders Dep. 64, ECF No. 52-1.)  Both firms told LTC Saunders that the STV HVAC design was inadequate. (*Id*. at 64, 73, 93.)

On July 13, 2000, LTC Saunders sent an e-mail to Krista Mortimer at Caswell with a "cc" to "Best, V." and "Deyo, D." (Am. Compl., Ex. B, ECF No. 37-1.) Victoria Best, an AOG employee, was the primary AOG fundraiser for the target system gift project. (Pl.'s Mem., Saunders Dep. 87, 139, ECF No. 52-1.)  Don Deyo from West Point's Department of Housing and Public Works was the initial project engineer on the IMC renovation project and, upon his retirement in early 2001, was replaced by Paul Simihtis, another West Point mechanical engineer. (*Id*. at 94; Def's

---

[1] (...continued)
Admis.1, A78.)

Mot., Shah Dep. 47-48, A229, ECF No. 44-1; Pl.'s Mem., Deyo Dep. 33, 68, ECF No. 51-1.)  Although addressed to Ms. Mortimer at Caswell, LTC Saunders e-mail (sent from his government address) was addressed to "Tracy."  Tracy Norton was the Caswell sales marketing representative that LTC Saunders dealt with in the acquisition of the range target systems.  (Pl.'s Mem., Saunders Dep. 91, ECF No. 52-1.)  The message stated:

> Tracy:
>
> Can't give you a detailed reply at the moment but your request for additional info was discussed at a meeting we had yesterday.  Someone, probably Don Deyo, will be getting back to you soon with the info you requested.
>
> The Target System contract will be with the AOG, not West Point. We will contract directly with Caswell Detroit Armor or Rangetech.
>
> The contract for the remainder of the project will be a government contract.
>
> The general contractor will be required to use either Caswell Detroit Armor or Rangetech for the Ventilation System portion of the government contract.  If you feel that your own system, not the one designed by STV, is superior and/or cheaper, a modification to the contract will be made and you may install your proprietary system.
>
> I will handle all aspects of negotiating the contract for the targeting system. Any questions you have concerning the ventilation system should be directed to Denise Conklin, 914-938-5102.  She works in the Directorate of Contracting here at West Point.
>
> Duston

(Am. Compl., Ex. B, ECF No. 37-1.)  As foundational to recovery, with reference to the ventilation system for the shooting ranges, which was not included in AOG's purchase, but, as designed by STV, was encompassed in the separate Army contract for the IMC renovation, plaintiff relies on Saunders' statement that Caswell may substitute its own system rather than STV's, if Caswell felt its design was "superior and/or cheaper."

In preparing a response to the July 11, 2000 Solicitation, plaintiff obtained proposals from Rangetech and Gleason & Elfering (G & E) for the HVAC system. (Def.'s Mot., Shah Dep. 23, 30, A223, A225, ECF No. 44-2.)  During this time

Caswell used G & E exclusively as its contractor for ventilation equipment. (Pl.'s Mem., Deyo Dep., Ex. 18 2, ECF No. 51-7.) Caswell and Rangetech were ventilation contractors; neither performed heating and air conditioning work. (Def.'s Mot., Shah Dep. 28, A224, ECF No. 44-2.) Accordingly, for the heating and air conditioning, plaintiff obtained a proposal from HVAK. (*Id.*) G & E's September 1, 2000 proposal to plaintiff for the HVAC portion of the contract was $570,000 and warned that it might not have complied with the Solicitation specifications.[2] (Def.'s Mot., Bott Dep., Ex. 1, A275-77, ECF No. 44-1.) "THIS PROPOSAL DOES NOT NECESSARY [SIC] MEET PLANS AND SPECIFICATIONS. GLEASON & ELFERING HAS REDESIGN [SIC] THE VENTILATION SYSTEM AND CORRECTED THE PREVIOUS DESIGN DEFICIENCIES ." (*Id.* at 276.) Also on September 1, 2000, plaintiff submitted its proposal to West Point. (*Id.*, Conklin Dep., Ex. 3, A162-200.)

West Point received four offers. (Pl.'s Mem., Saunders Dep. Ex. 5 at 1, ECF No. 55-1.) The Source Selection Decision concluded that "P&K's offer represents the best overall value to the Government," (*id.* at 6), and awarded the contract to plaintiff on September 28, 2000 at the price offered, $3,911,142.75, which was more than $440,000 below the next lowest offer. (*Id.* at 3, 5; Shah Dep. Ex. 2 at 2.) The Source Selection Decision noted that all of the offerors complied with the requirement to show proof of a subcontract relationship with Caswell or Rangetech.[3] (*Id.* at 1.) In this regard, plaintiff had submitted a letter dated August 24, 2000, that provided in pertinent part:

> Following are the major subcontractors we propose to use for this project.

---

[2] Presumably, G & E's disclosure that its proposal to plaintiff may not have complied with the specifications of the Solicitation was prompted by, or related to, LTC Saunders' e-mail.

[3] Plaintiff's August 24, 2000 letter to Denise Conklin also enclosed past performance information missing from its proposal. (Def.'s Mot. Conklin Dec. Ex. 2, A159, ECF No. 44-1.) The Source Selection Board (SSB) reviewed the four bids received and in its findings stated: "[p]lease note that all offers were required to include proof of its contractual relationship with one of the following: Caswell or Rangetech. All of the offerors complied with this requirement." (Pl.'s Mem., Saunders Dep. Ex. 5, ECF No. 55-1.) Although defendant asserts that plaintiff's bid was non-compliant because it failed to utilize an approved HVAC subcontractor, and plaintiff counters that G & E was an affiliate or agent of Caswell, it is not necessary to address this matter further.

> 1) HVAC Work – a Range International corp. [sic] or Caswell Detroit Armor company depending on who fits best to perform the work from availability of manpower for schedule completion and chemistry of personalities involved in the project.

(Def.'s Mot., Conklin Dec. Ex. 2, A159, ECF No. 44-1 (emphasis in original).)

Thereafter, plaintiff entered into a $570,000 subcontract with G & E for HVAC and a subcontract to HVAK Mechanical for HVAC work that G & E excluded from its subcontract. (Def.'s Mot., Shah Dep. 31-32, 39, A225, A227, ECF No. 44-2; Am. Compl., Ex. E, ECF No. 37-1.)  After the award of the subcontract to G & E, Michael Bott, G & E's project manager, and a professional engineer traveled from G & E's location in Mundelein, Illinois, to the IMC site where they spent three or four days. (Def.'s Mot., Shah Dep. 32, A225, ECF No. 44-2.)  Mr. Bott and his staff coordinated with Mr. Anant Shah of HVAK Mechanical, took measurements, developed drawings and prepared a package for plaintiff to submit to STV.  (*Id.* at 33, AR 225, 39-41, AR 227; Pl.'s Mem., Deyo Dep. Ex. 11, ECF No. 51-2.)  When the package was submitted to STV, STV objected to the G & E design that differed from the STV design for HVAC in the IMC contract.  (Def.'s Mot., Shah Dep. 45, A228, ECF No. 44-1.)

On December 14, 2000, plaintiff sent Request for Information (RFI No. 6 (Mechanical)) to Denise Conklin, the West Point contact for the IMC contract, comprising the following text:

> As discussed in the site meeting on December 04, 2000, our mechanical subcontractor has some serious concerns for [sic] ventilation system for the project. They fill [sic] that the system needs to be redesigned.  Our subcontractor has redesigned the system at no cost to the government.  The following criteria were considered
>
> > 1) Original design does not meet NIASH [sic] 76-130 code
> > 2) Equipment are [sic] under designed due to the above fact
> > 3) Original design does not create any negative pressure
> > 4) Concern that contract drawing calls for very little static pressure
> > and system cannot function
>
> As requested by you they have sent these revised drawings to STV, Inc. via e-mail on 12/7/00.  To date we have not received response to this issue.  Several of our submittals are held up due to this and will cause delays in completion of the project.

Please look in to the matter and do needful to expedite [sic] the resolution.  Attached is a copy of letter dated 12/01/00 from G & E, which was given to you in the meeting for your ready reference.

(Am. Compl., Ex. F, ECF No. 37.)

On December 29, 2000, Ms. Conklin responded:

Below is the Government response to your request for information number 6.

1.  Please supply specific information regarding the subcontractor's claim that the STV design does not meet NIOSH[4/] 76-130.  Copies of NIOSH 76-130, calculations, ventilation methods etc. need to be provided in order for the design to be properly reviewed.
2.  Provide justification for larger ducts.
3.  The design does not account for structural steel interferences and will result in duct modifications during installation, which will adversely affect the performance of the entire system.
4.  The high duct velocities and high static pressure will create noise problems.
5.  Your design does not address added heat load requirements from the additional air infiltration requirements.
6.  Your design does not allow for filter and coil maintenance.
7.  Your design does not utilize exhaust stacks thereby increasing the possibility of air contamination.
8.  Your design has exhaust ducts below the bottom cord of the existing trusses without baffle protection.
9.  Your design is rejected based on the above facts.  However the Government is concerned with the subcontractor's statements regarding the design but you need to provide all the facts to support that claim.

If you have any questions and or comments, please contact Denise Conklin at (845) 938-5102.

(*Id.*, Ex. H.)

In response, on January 3, 2001, plaintiff forwarded to Ms. Conklin a letter from G & E detailing seven problems with the STV design.  (Pl.'s Mem., Deyo Dep. 16, ECF No. 51-5.)  On January 19, 2001, Tracy Newton from Caswell e-mailed LTC

----

[4/]   NIOSH stands for the National Institute for Occupational Safety and Health.  *See* http://www.cdc.gov/niosh (last visited December 3, 2012).

Saunders with a brief update on the target systems work and to discuss "disturbing news" obtained when discussing the project with Michael Bott of G & E that the STV engineers were "not approving our equipment selection & arrangement." Mr. Newton stated that his "point is that [Caswell] wants to be sure that West Point gets the range they deserve and if the ventilation system does not function properly, I do not want that problem somehow tied to [Caswell] equipment." (Pl.'s Mem., Deyo Dep., Ex. 18 at 2, ECF No. 51-7.) Mr. Newton also noted that, while the ventilation portion of the project was funded separately from the target system, he felt LTC Saunders should be aware of what transpired and "perhaps get involved with this." (*Id.* at 3.)

G & E/Caswell informed plaintiff that they declined to install the STV designed ventilation system specified in the IMC contract out of concern that it would not work, and since they installed ranges worldwide, they did not want to ruin their reputation. (Def.'s Mot., Shah Dep. 51, A230, ECF No. 44-2.) G & E withdrew from its subcontract with plaintiff. (*Id.* at 58, A232.)

On February 1, 2001, West Point instructed plaintiff to comply with STV's HVAC specifications in the contract, but eliminated the requirement to use either Caswell or Rangetech. (*Id.*, Conklin Dec., Ex. 6, A211, ECF No. 44-2.)

Plaintiff then sought a substitute subcontractor and received two proposals. The lower proposal, submitted by HVAK Mechanical, of $783,500.00, exceeded the withdrawn G & E subcontract price of $570,000.00 by $213,500. (Am. Comp., Ex. M, ECF No. 37-1.) Plaintiff selected HVAK and HVAK installed the contractual STV HVAC design. (Def.'s Mot., Shah Dep. 59, 66, A232, A234, ECF No. 44-2.) After the project was completed, range users noticed that air flow from the HVAC system caused targets to sway. (*Id.*, Conklin Dec. ¶ 16, A89, ECF No. 44; Pl.'s Mem., Saunders Dep. 75, ECF No. 52-1; Def.'s Mot., Shah Dep. 109, A244, ECF No. 44-2.) To correct this problem, on September 8, 2003, West Point issued Modification No. 15 to plaintiff's contract which provided an additional $50,667.76 for the demolition of existing diffusers and "[r]einstallation of properly engineered laminar[5/] air diffusers." (Def.'s Mot., Conklin Dec. Ex. 7, A214, ECF No. 44-2.) Plaintiff did this work and was paid for it. (*Id.*, ¶¶ 17-18, A89, ECF No. 44-1.)

---

[5/]   Ms. Conklin's Declaration uses the term "laminate." (Def's Mem., Conklin Dec.¶ 17, A89, ECF No. 44-1.)

Plaintiff's rationale for its $245,525.00 claim is that, in reliance on the LTC Saunders' e-mail, G & E's price was for a less expensive redesigned HVAC system.[6] Plaintiff used G & E's price in preparing its successful bid for the IMC contract, contending, at least in response to defendant's initial Motion for Summary Judgment (ECF Nos. 21, 27), that it was unaware that G & E's proposal was for a different design. Thus, when G & E subsequently refused to install the STV design, plaintiff had to obtain a replacement HVAC subcontractor, which it did following the government's lifting of the limitation to the two previously approved subcontractors, at a cost to plaintiff of $245,525 in excess of G & E's price.

Notwithstanding that plaintiff's prospects for establishing a viable superior knowledge, equitable estoppel, or breach of the covenant of good faith and fair dealing claim for its $245,525 in increased HVAC cost asserted in its original Complaint (ECF No. 1) were problematical, the court declined to grant defendant's initial Motion for Summary Judgment concluding that if the following four elements were present, a claim of mutual mistake might exit:

(1) the parties to the contract were mistaken in their belief regarding a fact;

(2) that mistaken belief constituted a basic assumption underlying the contract;

(3) the mistake had a material effect on the bargain; and

(4) the contract did not put the risk of the mistake on the party seeking reformation.

*Atlas Corp. v. United States*, 895 F.2d 745, 750 (Fed. Cir. 1990).

By retaining STV to design the HVAC system included in the specifications for the IMC renovation, and at the same time mandating that the firm awarded the contract subcontract the HVAC portion to Caswell or Rangetech, the basic underlying assumption was that Caswell or Rangetech, recognized international shooting range construction experts, would subcontract to install the STV-designed HVAC system as specified. Plaintiff, in obtaining its HVAC price quote from a firm associated with Caswell, also assumed that G & E/Caswell would install the STV-designed system. In fact, G & E/Caswell would not install the STV-designed HVAC system and this basic, factual assumption underlying the contract was mistaken.

---

[6] Neither party questions whether G & E's system was "proprietary" (the term used in LTC Saunder's e-mail), or redesigned (as noted in G & E's proposal), or if any distinction has relevance.

> When, to safeguard its international business reputation and not for financial reasons, G & E/Caswell refused to install the STV system it considered to be inadequate, West Point had to delete the contractual mandate requiring subcontracting with Caswell or Rangetech and plaintiff had to abandon its reliance on G & E/Caswell and obtain a substitute HVAC subcontractor at additional cost to install the STV system which, in fact, did prove to be inadequate in operation.

*P&K Contracting, Inc.*, 2011 WL 4721846, at *7.

Finding the facts sufficiently analogous to those in *National Presto Industries, Inc. v. United States*, 338 F.2d 99, 167 Ct. Cl. 749 (1964), involving a mutual mistake of fact, to indicate the possibility of a similar recovery, limited additional discovery was allowed, after which renewed summary judgment motions were authorized. 2011 WL 4721846, at 11-12; Order, ECF No. 36; Order, ECF No. 41.

Subsequent discovery included the deposition of Michael Bott, who prepared G & E's subcontract proposal, and the conclusion of the deposition of Denise Conklin.[7] Documents produced included G & E's three-page proposal submitted to plaintiff that specified it did not necessarily meet the Solicitation specifications. Also, Mr. Bott testified that he told plaintiff's President, Rohit Shah, that G & E's proposal did not comply with the Solicitation specifications which Mr. Shah denied.[8] The contract between West Point and plaintiff does not contain G & E's qualifier quoted above and it is not contended that West Point knew that plaintiff's bid was based on G & E's non-compliant design.

No additional material facts were tendered that anyone with authority to bind the government either agreed that the HVAC specifications in the Solicitation could be altered or amended, or ratified or consented to such an accommodation.

---

[7] Denise Conklin, the West Point contracting specialist on this project, became a contracting officer (CO) in 2009.  (Def.'s Mot., Conklin Dec. ¶ 1, A87, ECF No. 44-1.)

[8]  In his deposition Mr. Bott testified that he had STV's design at the time he prepared G & E's proposal to plaintiff.  (Pl.'s Mem., Bott Dep. 25-26, ECF No. 47-3; Def.'s Mot., Shah Dep. 37-39, A226-27, ECF No. 44-2.)  Mr. Bott also testified that he informed Mr. Shah before he (Bott) submitted G & E's proposal to plaintiff, that STV's design did not meet Department of Defense (DOD) standards, and that G & E's proposal was for a different design.  (Pl.'s Mem., Bott Dep. 27-28, ECF No. 47-3.)  In his deposition, Mr. Shah disagreed. (Def.'s Mot., Shah Dep. 37-39, A226-27, ECF No. 44-2.)

While the mutual mistake the court referenced in its prior Order was a shared assumption that either of the two approved HVAC subcontractors would install the STV-designed HVAC system, which turned out not to be correct, the "mutual" mistake asserted in plaintiff's Amended Complaint and Motion for Summary Judgment is different.

> 48. Due to a mutual mistake, P&K's successful bid incorporated an approved subcontractor's bid premised on the representation that, with respect to the required HVAC unit, a "proprietary system" was approved prior to the entry of the Contract. (*See* ¶ 8, *supra*).

(Am. Compl. 6, ECF No. 37.)

The referenced Paragraph 8 provides:

> 8. Mr. Saunders also said to Mortimer (a Caswell representative) that if Caswell wanted to install its proprietary system in lieu of the system specified in the contract documents, then: "a modification to the contract **will** be made and you may install your proprietary system."

(*Id.* at 2 (parenthetical supplied; emphasis in original).)

In an attempt to reconcile this divergence, plaintiff's Opposition to the government's renewed Motion for Summary Judgment candidly characterizes its position as dependant on LTC Saunders' e-mail; specifically, whether, presuming it contained a promise to modify a future contract to permit deviation from its specifications, West Point was bound by, or ratified, that promise. The Opposition states:

> As stated by the Court, the Plaintiff and Defendant entered into the Contract with the mutual understanding that G & E would install the system designed by STV. Further, the parties believed that Gleason's bid was premised on the STV, as opposed to a proprietary, design. This is evidenced by P&K's lack of knowledge concerning the E-Mail and the SSB's finding that P&K's bid was sufficient. The Government ultimately received the STV designed system, albeit at a higher cost than set forth in P&K's initial bid. However, as established above P&K's initial bid factored in an artificially low cost. That the STV system proved to be flawed and the Government paid for its repair has no bearing on the fact that P&K was caused to expend additional funds in order to provide the STV designed system as opposed to the

system Gleason proposed.  The Government is only being asked to pay for what it now claims P&K was initially obligated to provide, the STV system.

Here there is no dispute that the Government intended to pay for the HVAC system and that the system it demanded was that designed by STC [sic].  P&K's bid was premised on Gleason's subcontract proposal and therefore artificially low as it was premised on the E-Mail's assertion that a proprietary system could be installed.  Mr. Bott confirmed that had the STV system been bid, the price would have been higher by approximately $200,000.  **Stated differently, had the E-Mail never been sent, the issues presented in this case would never have arisen**.  The Court correctly stated that the issues presented herein are analogous to those in *Nat'l Presto Indus. supra*.  Therefore, the Court should grant P&K's cross-motion concerning mutual mistake.

(Pl's. Op. 37-38, ECF No. 47 (emphasis supplied, citations omitted).)

Assuming *arguendo* that LTC Saunders' e-mail statement constitutes an unconditional amendment to the Solicitation, as a matter of law under the undisputed material facts presented, LTC Saunders lacked actual or implied authority to so act.  Accordingly, defendant's second Motion for Summary Judgment is due to be granted and plaintiff's Cross-Motion due to be denied.

## Summary Judgment Standards

Summary judgment is appropriate when there are no genuine disputes over material facts and the moving party is entitled to prevail as a matter of law.  RCFC 56(a).  *See Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987).  A genuine dispute concerning a material fact exists when the evidence presented would permit a reasonable jury to find in favor of the non-movant.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).   In determining whether there is a genuine issue of material fact, the court will assume the truth of the evidence presented by the non-moving party and draw all reasonable inferences therefrom in the non-movant's favor.  *Id*. at 255.  A fact is material if it would make a difference in the result of the case.  Irrelevant or tangential factual disputes do not preclude the entry of summary judgment.  *Id*. at 247-48.  *See also Monon Corp. v. Stoughton Trailers, Inc*., 239 F.3d 1253, 1257 (Fed. Cir. 2001).

**Burden**

In opposition to defendant's second Motion for Summary Judgment and in support of its own, plaintiff contends that defendant failed to establish that the individuals plaintiff relied on for promises, as a matter of law, under the facts tendered, did **not** have authority to agree to amend the contract to allow the installation of an HVAC system other than as contractually required, or to ratify such a promise. Defendant disagrees, countering that its burden is merely to point out the lack of material evidence to support plaintiff's case and that it is incumbent on plaintiff to tender facts that, if proven, would establish a mutual mistake or a binding promise by West Point to modify the contract.

Clearly, plaintiff has the burden to establish that the contract is other than what it says it is, and its defensive observation that defendant did not establish that plaintiff cannot prove its case is simply wrong. *Crown Operations, Int'l v. Solutia, Inc.*, 289 F.3d 1376, 1377 (Fed. Cir. 2002); *George Family Trust ex rel. George v. United States*, 97 Fed. Cl. 625, 633 (2011) ("Following defendant's motion, it was incumbent upon plaintiff to rebut defendant's showing by 'point[ing] to an evidentiary conflict created on the record at least by a counter statement of a fact or facts set forth in details.'" (alteration in original, internal quotations omitted) (quoting *Processed Plastics Co. v. United States*, 473 F.3d 1164, 1170 (Fed. Cir. 2006)). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). Moreover, that there are cross-motions on mutual mistake does not require defendant to come forward with evidence. Rather defendant can rely on plaintiff's failures in this regard. "If, for example, the movant bears the burden [of proof] and its motion fails to satisfy that burden, the non-movant is 'not required to come forward' with opposing evidence." *Saab Cars USA, Inc. v. United States*, 434 F.3d 1359, 1368 (Fed. Cir. 2006) (quoting *Adickes v. S.H., Kress & Co.*, 398 U.S. 144, 160 (1970)).

## Discussion

This was a fixed priced contract.[9/] Plaintiff contends its bid was artificially low because it included G & E's proposal that varied from the specifications. After West Point insisted on compliance with the STV specifications in the contract, G & E withdrew from its contract with plaintiff, not wanting to be associated with an HVAC system it felt was defective. West Point then removed the requirement that either Caswell or Rangetech provide the HVAC system and plaintiff sought a substitute subcontractor to build per the STV specifications. The lowest bidder was some $245,525.00 more than the original G & E bid, and it is that cost that plaintiff seeks in this litigation in the form of an equitable adjustment.

## Authority

Although plaintiff presents several theories of recovery, authority to agree to modify the contract specifications is a prerequisite to most if not all of those theories.

In responding to defendant's Motion and in support of its own, plaintiff must establish as undisputed that either LTC Saunders or Mr. Deyo had actual or implied authority to agree to modify the contract, or plaintiff must tender genuine issues of material fact that would, as a matter of law, support that conclusion. Plaintiff wrongly assumes apparent authority is sufficient. "Where a party contracts with the government, apparent authority of the government's agent to modify the contract is not sufficient, an agent must have actual authority to bind the government." *Winter v. Cath-Dr/Balti Joint Venture*, 497 F.3d 1339, 1344 (Fed. Cir. 2007) (finding resident-officer in charge lacked actual authority to change contract scope of work or authorize additional payment) (citing *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997)). "[A]ctual authority may be express or implied from the authority granted to that agent." *Id.*

Circumscribed limits of express, or actual authority in government contracts are well established. *Id.* (citing regulations generally limiting such authority to contracting officers). As was "very clear" in *Winter*, the contractor's reliance on

---

[9/]   Plaintiff admits that the Solicitation "anticipated" a fixed-price contract, but that the "[c]ontract itself appears silent on this point." (Pl.'s Mem. 21, n.12, ECF No. 47.) The contract was for a fixed price of $3,366,878.75. (Def.'s Mot., A162, ECF No. 44.)

authority of the contracting officer's representative or project engineer did not supply required authority because delegated authority was limited and "did not include the authority to make contract modifications, nor could it have." *Id*. at 1345 (citing 48 C.F.R. § 201.602-2 (1998) prohibiting "delegated authority to make any commitments or changes that affect price, quality, quantity, delivery, or other terms and conditions of the contract"). Also, the contract proscribed such express authority. "The contract is clear, only the CO had the authority to make modifications." *Id*. at 1346. Plaintiff's contract contains the same restriction. "Changes in the scope of work or any increase or decrease in scope of work shall be made only be [sic] the Contracting Officer by a properly executed modification." (Def.'s Mot., A189, ECF No. 44-1.) Indeed, plaintiff admits that LTC Saunders, the author of the e-mail upon which plaintiff relies, did not have the authority to modify the contract. (Def.'s Mot., Pl.'s Resps., Req. Admis. 6, A79, ECF No. 44-1.) Accordingly, under the undisputed material facts, no agreement was made to modify the contract specifications as G & E did in its proposal to plaintiff.

Likewise, no facts are tendered that anyone with authority under the contract ratified any representation in LTC Saunders' e-mail. "Ratification requires knowledge of material facts involving the unauthorized act and approval of the activity by one with authority." *Winter*, 497 F.3d at 1347 (citing *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1433-34 (Fed. Cir. 1998)). The CO would have had to ratify any representations. *Id*. at 1346. To the extent plaintiff contends that Mr. Deyo was copied on the e-mail and his knowledge could be imputed to the CO, despite any evidence that the CO was so aware, silence and lack of response from the CO forecloses any ratification. *Harbert/Lummus*, 142 F.3d at 1433-34. Likewise, plaintiff's citation to a draft e-mail from LTC Saunders addressed to G & E submitted to the West Point contracting office but never sent, is of no material significance. Cited as evidence that the CO knew of LTC Saunders' e-mail at least as of the date of the draft memo, January 22, 2001, fails to establish ratification as a matter of law.

Similarly, plaintiff's institutional ratification claim is legally deficient. Plaintiff cites a case involving an alleged reward agreement with a confidential informant, *SGS-92-X003 v. United States*, 74 Fed. Cl. 637, 654 (2007) (sanctioning ratification when "the Government seeks and receives the benefits from an otherwise unauthorized contract"). However, one with contracting authority "'must know of the unlawful promise.'" *Id.* (quoting *Gary v. United States*, 67 Fed. Cl. 202, 217 (2005)).

Actual knowledge by one with contracting authority is "a key element of an institutional ratification." *Id.* at 216. *See City of El Centro v. United States*, 922 F.2d 816, 821 (Fed. Cir. 1990); *cf. Janowsky v. United States*, 133 F.3d 888, 892 (Fed. Cir. 1998) (reversing dismissal of implied-in-fact contract claim without considering institutional ratification when FBI "allow[ed] the sting operation to continue and [received] benefits from it"). *See also Doe v. United States*, 58 Fed. Cl. 479, 486 (2003) ("Knowledge is the key distinguishing factor in all cases discussing institutional ratification; that is, in the absence of some indication, beyond mere assertions, that officials with ratifying authority knew of the unlawful promise, institutional ratification has not been upheld.")

Plaintiff contends that implied authority (which assertedly exists as to these individuals in these circumstances) is sufficient to bind the government, citing *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989) and *Lublin Corp. v. United States*, 98 Fed. Cl. 53 (2011).

Plaintiff's reliance on implied authority and on *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989) fails as a matter of law on the facts tendered. In *Winter*, the Federal Circuit contrasted *H. Landau*, where the government agent with authority to draw checks on a government bank account was found to have implicit authority to guarantee payment, with the contract dispute presented in *Winter,* where the contract and regulation limited authority to the contracting officer, in which instance implied authority was found to be precluded.

> Authority to bind the government may be implied when it is an integral part of the duties assigned to the particular government employee. *See H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989) (internal citations omitted). In *Landau*, we held that a government employee possessing both the authority to ensure that a contractor acquired the raw materials needed to fulfill a contract and the authority to draw checks on the government bank account may have also had the "implicit authority" to guarantee payment to the contractor's supplier of raw materials. *Id*. *Landau*, however, is inapposite to this case. Here, the [Resident Officer in Charge of Construction] could not have had the implicit authority to authorize contract modifications because the contract language and the government regulation it incorporates by reference explicitly state that only the contracting officer had the authority to modify the contract. Modifying the contract could not be "considered to be an integral part of [project manager's] duties" when the contract explicitly and exclusively assigns this duty to the CO. *Id*. We cannot conclude that [the government's project manager] had implied authority to direct changes in the contract in contravention of the unambiguous contract language.

497 F.3d at 1346. *Lublin Corp. v. United States*, 98 Fed. Cl. 53 (2011), also cited by plaintiff, recognized the absence of implied authority where "the authority to enter into a contract was given explicitly to another official." *Id.* at 56.

As binding precedent, *Winter* as a matter of law, disposes of plaintiff's reliance on implicit authority. *See also Salles v. United States*, 156 F.3d 1383, 1383-84 (Fed. Cir. 1998) (affirming summary judgment for government where no facts of implied actual authority were tendered).

Also, the CO's failure to assign a contracting officer's representative (COR) cited by plaintiff as adding validity to its position that other than the CO had requisite authority, lacks relevance. As in *Winter*, while the contract required a COR, the COR's authority was limited and specifically excluded modifying the scope of work, reserving that authority exclusively to the CO.[10]

Plaintiff's reference to many facts as suggestive of authority or as creating factual issues in this regard, does not do either. Private/government funding, job

---

[10] 52.034-4002 CONTRACTING OFFICER'S REPRESENTATIVE (COR)

(a) The Government shall designate an individual as the COR, who shall be responsible for monitoring the performance of routine work and project work by the contractor as to conformance with the Special Conditions, Technical Specifications, Bid Schedules, and Plans of the Contract. He shall have the authority to call attention to discrepancies between the contractor's performance and the specifications, and to request the contractor to take immediate actions as may be required for unplanned work. The individual appointed as the COR will be specifically designated by a letter from the Contracting Officer and a copy of the letter will be furnished to the contractor.

(b) The COR shall represent the Contracting Officer only as specified in the Letter Delegation of Authority. **The COR is not authorized to issue change orders, contract supplements or direct any contract performance requiring contractual modification or adjustment. Changes in the scope of work or any increase or decrease in scope of work shall be made only by the Contracting Officer by a properly executed modification**. He is responsible for initial approval of the contractor's invoices, based on the contractor's compliance with the conditions of this contract.

(Def.'s Mot., Conklin Dec. Ex. 3, A189, ECF No. 44-1 (emphasis supplied).)

descriptions and e-mail addresses, while not disputed by defendant, do not, as a matter of law, confer the actual or implied authority required.  Despite undertaking additional discovery to accommodate full factual development, no genuine issues of material fact to alter the undisputed facts presented are tendered, and plaintiff does not contend that additional discovery was necessary to respond.[11/]

## **Mutual Mistake**

"Generally, a contractor may obtain reformation or rescission of the contract only if the contractor establishes that its bid error resulted from a 'clear cut clerical or arithmetical error, or a misreading of the specifications.'" *Giesler v. United States*, 232 F.3d 864, 869 (Fed. Cir. 2000) (citing *Liebherr Crane Corp. v. United States*, 810 F.2d 1153, 1157 (Fed. Cir. 1987)).  In *Giesler*, the Federal Circuit held that a contractor's failure to read specifications in preparation of its bid constituted gross negligence, not an excusable "misreading" that would warrant equitable relief where the specifications required a mixed nuts composition with no more than 10% peanuts by weight, and the contractor's bid was based on supplying a less costly 60% peanut mixture, resulting in a lower bid.  In reversing summary judgment for the rescission of the contract for mutual mistake, the Federal Circuit remanded for entry of judgment on the government's "counterclaim for excess reprocurement costs," 232 F.3d at 877.  In *Liebherr Crane Corp.* the Federal Circuit explained that if mistake is mutual, the government is precluded from enforcing the contract and the contractor is relieved of any liability therefore, but concluded that the situation there presented was a unilateral mistake, not a clerical or arithmetical error or a misreading of the specifications, rather a result of the contractor's gross negligence in failing to read the specifications correctly, misjudging the type of crane that would be required and submitting a bid that was dramatically lower.  Accordingly, equitable adjustment was denied.  Applying these precedents to the matter at bar, plaintiff's unilateral mistake in bidding, does not as a matter of law, warrant reformation.

---

[11/] Although arguments of the parties as well as the court's analysis focus on questions of authority, even if authority were found, LTC Saunders' e-mail is far from unequivocal, speaking of substitution of specifications if Caswell "feels" its design is superior – an undefined standard.  The e-mail then points out that except for the target system, the project would be a government contract, and that questions about the ventilation system should be referred to Ms. Conklin at the West Point Directorate of Contracting, making reliance on LTC Saunders' statement for any agreement to alter specifications, questionable.

Defendant reiterates the court's original description of a possible mutual mistake being the assumption by both West Point and plaintiff that either Caswell or Rangetech would install the STV-designed HVAC system.

That however, as previously noted, is not the mistake pled in plaintiff's Amended Complaint, which continues its original theory that the "mistake" "shared" by both plaintiff and West Point was that G & E, plaintiff's subcontractor, based its subcontract on the Solicitation specifications. West Point in awarding the contract had no knowledge that plaintiff's bid which used G & E's subcontract proposal, was not based on the Solicitation specifications. Plaintiff's mistake was unilateral – it failed to read or comprehend G & E's three-page proposal which specified it may not be based on the specifications, and then incorporated that "artificially" low cost into its (plaintiff's) bid to West Point. West Point was not mistaken. On its face plaintiff's bid met the specifications. Plaintiff did not forward G & E's "redesigned" system to West Point's attention until after it was awarded the contract. (Am. Compl., Ex. F, ECF No. 37-1.)

Moreover, questions of authority aside, LTC Saunders' e-mail speaks of future events – amendment of the contract – which cannot form the basis of mutual mistake.[12] *Dairyland Power Coop v. United States*, 16 F.3d 1197, 1203 (Fed. Cir. 1994) ("[M]utual mistake of fact cannot lie against a future event."); *Northrop Grumman Corp. v. United States*, 47 Fed. Cl. 20, 52-56 (2000) (stating that mutual mistake must relate to events or facts as of the time of contracting, not some future occurrence); *Shear v. Nat'l Rifle Ass'n of Am.*, 606 F.2d 1251, 1260 (D.C. Cir. 1979) (explaining that the "mistake doctrine does not apply to predictions or promises of future conduct").

Additionally, many of plaintiff's cited authorities are not pertinent. In discussing *National Presto*, plaintiff would extend its reasoning and result to the case *sub judice*, citing *George Sollitt Construction Co. v. United States*, 64 Fed. Cl. 229 (2005). In *George Sollitt Construction Co.*, the additional costs of revisions to the contract requirements were split equally between the contractor and the government, because of "not so much mistake as inadvertence [and] because both parties shared in causing the added costs, the only just solution is to have both parties bear the

---

[12] The Solicitation was dated July 11, 2000, the e-mail July 13, 2000 and the contract award on or about September 28, 2000. (Def.'s Mot., A92, A13, A162, ECF No. 44-1.)

burden of their carelessness."  64 Fed. Cl. at 298.  In *R.M. Hollingshead Corp. v. United States*, 124 Ct. Cl. 681, 111 F. Supp. 285 (1953), the contract concerned the provision of DDT Concentrate, then a relatively new product.  The contract specifications required storage in metal containers and that the liquid concentrate remain clear for at least a year.  It was subsequently determined that storage in metal containers turned the product cloudy, and "neither the plaintiff nor the Government knew that it was impossible to store DDT Concentrate in the metal containers prescribed in the contract without a resulting loss of its clear color."  111 F. Supp. at 286.  This indeed was a mutual mistake and the case, as well as other mutual mistake authorities cited by plaintiff, are clearly distinguishable.[13]

Plaintiff merely incorporated G & E's price into its bid after adding its profit and overhead.  No evidence is tendered that G & E's proposal was part of the record reviewed by the SSB.  Plaintiff's bid to West Point did not include HVAC costs per the Solicitation specifications.  No evidence is tendered that the CO was aware of this

---

[13]  *Dugan Construction Co. v. New Jersey Turnpike Authority*, 941 A.2d 622 (N.J. Super. Ct. App. Div. 2008) concerned what turned out to be a mistake on the part of the government in the estimated amount of wastewater to be removed, which the contractor must have known about and utilized in its proposal to its economic advantage.  The contract required estimating errors be brought to the attention of the government which was not done.  Applying New Jersey precedent, reformation was ordered.  In *United States v. J & E Salvage Co.*, 55 F.3d 985, 987 (4th Cir. 1995), a contractor purchased shipping containers at a military surplus auction and unbeknownst to either the contractor or the government, inside the containers were helicopter transmissions.  Finding the dispute arose under the Contract Disputes Act, 41 U.S.C. § 601 *et seq.*, the Fourth Circuit dismissed the case for lack of jurisdiction.  *SW Welding & Mfg. Co. v. United States*, 179 Ct. Cl. 39, 373 F.2d 982 (1967) reformed the contract when both the contractor and the government shared the mistaken notion of the contractor's steel procurement costs.  In *Bowen–McLaughlin–York Co. v. United States*, 813 F.2d 1221 (Fed. Cir. 1987), applying *Southwest Welding,* the court noted that "both the Government and the contractor intended that the latter be compensated on the basis of its actual costs," therefore, reformation was appropriate to reflect the shared intentions (costs) of the parties. 813 F.2d at 1222. *Appeal of Louisiana-Pac. Corp.*, AGBCA No. 80-186-3, 81-1 BCA ¶ 14,928 (Feb. 13, 1981) involved mutual mistake as to estimated quantities.  *Jeppesen Sanderson, Inc. v. United States*, 868 F.2d 1277 (Fed. Cir. 1989), an unpublished opinion, *see* Fed. Cir. Rule 32.1(c), allowed reformation due to a "mutual mistake concerning the district court's power relative to the enforcement of [an] indemnity agreement."  *Matter of Morgan Roofing Co.*, Comp. Gen. Dec. B-181885 (Dec. 17, 1974) 54 Comp. Gen. 497, 498 concerning mutual mistake, does not alter the court's conclusions herein. *URS Group, Inc. v. Tetra Tech FW, Inc.*, 181 P.3d 380, 390 (Colo. Ct. App. 2008) cited New Jersey law allowing reformation of a contract on the basis of mutual mistake and indicating that a party's negligence in failing to ascertain the mistake was not a bar to reformation.

shortfall.  Plaintiff's mistake was unilateral.  As a matter of law, plaintiff fails to state a valid cause of action for equitable adjustment based on mutual mistake.

## Risk of increased costs

Mutual mistake and authority to amend contract specifications aside, the undisputed material facts are that plaintiff submitted a bid price that included G & E's subcontract bid that unbeknownst to the government, did not comply with the government contract specifications, and was therefore at an "artificially" low price. Nevertheless, the government contends that, as a matter of law, in this fixed price contract plaintiff bore that risk and attendant financial consequences.  *United States v. Spearin*, 248 U.S. 132, 136 (1918); *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1579 (Fed. Cir. 1997); *ITT Arctic Servs., Inc. v. United States*, 524 F.2d 680, 691 (Ct. Cl. 1975) ("[T]he contractor in a fixed-price contract assumes the risk of unexpected costs.  In firm fixed-price contracts, risks fall on the contractor, and the contractor takes account of this through his prices." (citations omitted)); *Am. Tel. & Tel. Co. v. United States*, 307 F.3d 1374, 1380-81 (Fed. Cir. 2002); *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1296 (Fed. Cir. 2002); *Dalton v. Cessna Aircraft Co.*, 98 F.3d 1298, 1305 (Fed. Cir. 1996).

That the contract was fixed price does not end the inquiry and does not eliminate all possible recovery plaintiff counters, citing *National Presto Industries, Inc. v. United States*, 338 F.2d 99, 167 Ct. Cl. 749 (1964) cited in the court's earlier Order.  In the context cited by the court, and as discussed *infra, National Presto* accommodated the parties' mutual mistake and allowed equitable adjustment despite the contract's fixed price.  *See also Southwest Welding & Mfg., Co.*, 179 Ct. Cl. 39, 373 F.2d 982 (1967) (reforming contract when both contractor and the government were mistaken about contractors' steel acquisition cost).

Under the undisputed material facts, mutual mistake is not present here and the risk of loss rule applies, precluding recovery by plaintiff.

## Implied warranty - adequate specifications

Plaintiff adds that the *Spearin* doctrine defendant cites for its position that plaintiff bore the risk of a non-compliant subcontract, also imposes on West Point an implied warranty that if the contract specifications are followed, the result will be

acceptable, a warranty that was breached here plaintiff concludes, contending that the HVAC system as designed and required by the contract was defective; accordingly, plaintiff is entitled to recover costs proximately flowing from the breach, here the additional $245,525.00 cost for a substitute contractor to build per the original STV specifications. *Franklin Pavkov Constr. Co. v. Roche*, 279 F.3d 989, 994-95 (Fed. Cir. 2002).

Responding, defendant notes that the design issues that G & E identified in discussions with West Point and STV representatives were lead poisoning and air pressure issues not the post-construction excess airflow problem remedied by contract modification followed by full payment to plaintiff. Accordingly, there were no additional consequential costs for this "defect." While lead poisoning and air pressure were the design defects G & E asserted, neither West Point nor STV concurred, and importantly, this issue did not cause any increased costs to plaintiff. Accordingly, there was no defect in the contract specifications that was not remedied by a contract modification for which plaintiff was fully paid.

### Superior Knowledge

The superior knowledge doctrine is a narrow exception to the general rule that contractors in a firm, fixed-price contract assume the risk of increased performance costs. *Helene Curtis Indus., Inc. v. United States*, 160 Ct. Cl. 437, 441-44, 312 F.2d 774, 777-78 (1963). Defendant posits that the facts plaintiff tenders, even if true, would not fulfill the requisites for such cause of action which requires that plaintiff:

> (1) undert[ook] to perform without vital knowledge of a fact that affects performance costs or direction, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

*GAF Corp. v. United States*, 932 F.2d 947, 949 (Fed. Cir. 1991) (citation omitted). Plaintiff has not met that threshold. The solicitation required compliance with the HVAC specifications provided; plaintiff's subcontractor provided plaintiff with a quote that was not based on those specifications but plaintiff incorporated that quote into its successful proposal. West Point was not aware that plaintiff's bid was at a lower cost due to a noncompliant HVAC design.

In denying plaintiff's initial motion for summary judgment, the court noted that, plaintiff's ability to establish a viable "superior knowledge" claim was problematic because neither plaintiff nor G & E obtained any assurances from any person having authority to bind the government that the contractual HVAC design would be modified. *See Johnson Mgmt. Group CFC, Inc. v. Martinez*, 308 F.3d 1245, 1255 (Fed. Cir. 2002); *Melrose Assocs. L. P. v. United States*, 45 Fed. Cl. 56, 60-61 (1999).

In its Amended Complaint (ECF No. 37), plaintiff's superior knowledge claim is that its bid was made without knowledge that subcontractor G & E's quote, incorporated into plaintiff's bid, was based on the representation by LTC Saunders that the contract specifications would be modified by amendment to allow for G & E's own HVAC design. No authority is cited that an e-mail authored by one who cannot bind the government and not sent to the contracting officer can result in "superior" knowledge in any event, particularly when plaintiff was given express notification in the subcontract bid that it may not comply with the specifications.

Plaintiff is responsible for verifying that its subcontractor's proposal complied with the specifications of the Solicitation, and failure to do so does not implicate superior knowledge. *Giesler*, 232 F.3d 864 (finding the contractor was not excused from failure to read the nut mixture specification (no more than 10% peanuts) and also that rescission was not warranted due to the government's failure to examine subcontractor's post-bie fax which would have disclosed discrepancy; accordingly superior knowledge doctrine was inapplicable); *Connor Bros. Constr. Co. v. United States*, 65 Fed. Cl. 657, 689 (2005) (holding superior knowledge test not satisfied when contractor "simply exercised misjudgment on its part when it relied on its own and its subcontractor's less-than-thorough review of the contract materials and did not inquire with the Corps about the [site] conditions").

## Equitable Estoppel

The elements of equitable estoppel are: "'(1) misleading conduct, which may include not only statements and actions but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice if the delayed assertion of such rights is permitted.'" *Mabus v. Gen. Dynamics C4 Sys., Inc.*, 633 F.3d 1356, 1359 (Fed. Cir. 2011) (quoting *Lincoln Logs Ltd. v. Lincoln Pre-Cut Log Homes, Inc.*,

971 F.2d 732, 734 (Fed. Cir. 1992)).  Regardless of whether plaintiff knew of LTC Saunders' e-mail prior to the submission of its bid, no genuine material facts have been tendered that LTC Saunders had authority to obligate West Point to a future contract amendment or equitable adjustment, or that West Point ratified or adopted any such representation.  *Byrne Org., Inc. v. United States*, 152 Ct. Cl. 578, 287 F.2d 582, 587 (Ct. Cl. 1961) ("It is an established proposition that estoppel cannot be set up against the Government on the basis of an unauthorized representation or act of an officer or employee who is without authority in his individual capacity to bind the Government."); *Doe v. United States*, 48 Fed. Cl. 495, 505 (2000); *Connor Bros. Constr., Co.*, 65 Fed. Cl. at 693 (rejecting contractor's equitable estoppel claim, because "the government person who purportedly agreed to [the contractor's] proposed price modification . . . did not possess the requisite authority to bind the government.").  Also, plaintiff did not point to any affirmative misconduct on the part of the government, which the Federal Circuit has held is a necessary prerequisite for estoppel.  *Rumsfeld v. United Techs. Corp.*, 315 F.3d 1361, 1377 (Fed. Cir. 2003). Accordingly, plaintiff has not raised material factual issues that if proven would lead to cognizable equitable estoppel claim.

Finally, reference to 48 C.F.R. § 5.101, which requires dissemination of procurement information, does not create a cause of action for plaintiff.  Only if the e-mail was a promise to amend the Solicitation specifications, and written or ratified by one with authority, might the cited regulation have pertinence.

### Covenant Of Good Faith And Fair Dealing

The implied covenant of good faith and fair dealing "requires a party to not interfere with another party's rights under the contract."  *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 828 (Fed. Cir. 2010).  The covenant may be breached when, "in ways unenvisioned by the contract, a party proceeds in a fashion calculated to frustrate or hinder performance by its contracting partner."  *N. Star Alaska Hous. Corp. v. United States*, 76 Fed. Cl. 158, 188 (2007).  Any breach however, must be tethered to some substantive obligation in the contract.  *Centex Corp. v. United States*, 395 F.3d 1283, 1306 (Fed. Cir. 2005) (noting that the covenant does not result in the "expansion of the government's duties under the contract or for a duty that is inconsistent with some provision of the contract"); *Alaska v. United States*, 35 Fed. Cl. 685, 704 (1996) ("The implied obligation of good

faith and fair dealing must attach to a specific substantive obligation, mutually assented to by the parties.").

Although the court's prior Order concluded any viable action on this ground was problematic, to the extent further disposition is required, defendant reiterates that nothing West Point did or failed to do hindered contract performance, and insistence that plaintiff perform per the contract specifications, on the facts tendered here, simply did not violate either the contract or this implied covenant.

Plaintiff contends that West Point's demand that plaintiff perform specifications that were faulty; knowledge of asserted design defects via G & E engineer Michael Bott and initial expression of interest in the defects asserted; request for additional information (which was provided); reiterated insistence on compliance with the STV specifications; and removal of the requirement for installation by one of the two approved subcontractors, all preclude entry of summary judgment. Concluding that "the government's insistence that [plaintiff] install a system it knew or should have known to be incomplete and improper is inherently unreasonable and it follows that the government cannot succeed on its motion for summary judgment in this instance." (Pl.'s Mem. 32, ECF No. 47.) Plaintiff's reliance on Ms. Conklin as confirming that the STV design was a failure is not helpful in this regard. The flaws mentioned by Ms. Conklin were the airflow issues solved by the diffusers installed under a contract amendment for which plaintiff was fully paid.

No authority has been provided that would relieve plaintiff from its failure to fully read G & E's proposal or its contention that it had no reason to suspect that it would receive a non-compliant bid as only two approved subcontractors who had an opportunity to review the specifications were considered. It did so at its own peril. By requiring use of either Rangetech or Caswell, the government did not represent that "the named sources are ready, willing and able to do the work contemplated by the contract ." *Franklin E. Penny Co. v. United States*, 207 Ct. Cl. 842, 853 (1975). Moreover, "no breach of contract may be imputed to the United States simply because the manufacturers that it had listed as approved sources of supply declined to undertake the work for which they had been found qualified." *Id.* at 854.

**Conclusion**

Returning to plaintiff's characterization of the gravamen of its case, no material facts have been tendered that LTC Saunders had any authority to bind the United States to modify the contract, nor did Mr. Deyo have authority to ratify. Accordingly, LTC Saunders' e-mail which apparently caused G & E to submit an artificially low HVAC price to plaintiff has no legal significance and cannot serve as the bedrock of plaintiff's case.

Moreover, the court's conclusions herein follow careful consideration of the questions plaintiff presented at the beginning of its Memorandum of Law in Opposition to Defendant's Second Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment (ECF No. 47).

The court has reviewed all other arguments raised by plaintiff and finds they would not alter the result reached here. As a matter of law under the material facts for which there is no genuine dispute, no valid causes of action are stated. Plaintiff failed to set forth genuine issues of material fact that could result in actual or implied authority of LTC Saunders or Mr. Deyo to promise the contract amendment underlying the equitable adjustment plaintiff seeks. Material facts presented and tendered do not constitute mutual mistake. No viable recovery based on defective plans or specifications is pled; no viable claim for superior knowledge, equitable estoppel, violation of FAR § 5.101, or breach of the covenant of good faith and fair dealing is stated.

Accordingly, it is hereby **ORDERED** that:

(1) Defendant's Second Motion for Summary Judgment (ECF No. 44) is **GRANTED**;

(2) Plaintiff's Cross-Motion for Summary Judgment (ECF No. 47) is **DENIED**; and

(3) The Clerk is directed to enter judgment for defendant.

s/ James F. Merow
James F. Merow
Senior Judge